| 13 113|
|e114 881|

## SUCCESSION OF MICHAEL SCHAFFER.

When a curator's account is homologated only in "so far as not opposed," the heirs are not concluded as to items in the account to which opposition was filed by creditors.

The treaty between the United States and France, the effect of which was to suspend the State law imposing a tax of ten per cent. on successions falling to foreign heirs, stipulates, "it shall remain in force for the space of ten years *from the day of the exchange of the ratifications*, which shall be made in conformity with the respective Constitutions of the two countries, and exchanged at Washington within the period of six months or sooner, if possible" *Held:* That under such a stipulation, the ratifications did not relate back to the date when the treaty was signed.

The treaty did not become operative until the exchange of ratifications on the 11th of August, 1853

APPEAL from the Second District Court of New Orleans, *Morgan*, J.

*V. F. Cotton*, for curator and appellant. *J. A. Rozier*, for appellees.

SPOFFORD, J. It may be conceded that an unqualified homologation, after due advertisements and delays, of a curator's account and statement of debts, is binding upon the heir in the absence of fraud.

But here it does not appear that the items in controversy have been passed upon. The account was homologated only in "so far as not opposed." The opposition of *Michel* and *Gilmore*, attacked the items now in question. Those items having been opposed, are not covered by the terms of the decree.

The oral testimony offered, if admissible, is insufficient to conclude the heirs against questioning the items not homologated. The evidence as to what their agent, *Kern*, said to the administrator, *Kaiser*, is too loose to authorize the inference that he made such a settlement as was contemplated by his power of attorney. And his written receipt to *Kaiser* is couched in guarded terms, acknowledging no specific debts, but allowing him to retain the balance not receipted for, "to reimburse him for debts paid by him against said succession and to pay all the debts that shall be *legally* brought against the same." This receipt also authorized the administrator "to pay any debts that may be just and reasonable, and to resist any that may be unjust."

In the answer to the appeal, the heirs, subjects of the Emperor of the French, have prayed for an amendment in their favor, rejecting the item allowed by the District Judge to be retained by the administrator for the tax of ten per cent. alleged to be due by the foreign heirs upon the succession falling to them, by virtue of the fourth section of the Act of March 26th, 1842. Session Acts, p. 435.

The appellees contend that the fourth section of the Act of 1842, is suspended by an existing treaty or consular convention between the United States and France, and that the said treaty was in force at the death of *Michael Schaffer* on the 22d July, 1853, so that no right to claim the tax were vested in the State of Louisiana.

In the *Succession of Prévost*, 12th Annual, p. 577, we held that the treaty could have no retroactive effect, and if a right to claim the tax vested in the State before the treaty was in force, the claim could be enforced by legal proceedings afterwards. And this opinion was affirmed by a judgment of the Supreme Court of the United States upon a writ of error. See *Prévost* v. *Greneaux*, 19 Howard, 1.

But in that case the decedent's death occurred before the treaty was signed,

15

to wit, in 1848. In the *Succession of Dufour*, 10 An. 392, we held that the rights of the heirs of a party who died on the 14th of August, 1853, vested after the consular convention went into effect, and that the tax could not be imposed during the continuance of the treaty, because, for that period the State law would be paralysed by the paramount law.

We have now to determine whether this treaty was in force and effect upon the 22d July, 1853.

It was signed at Washington on the 23d of February, 1853, and ratified by the Senate of the United States on the 1st of April, 1853 ; the ratifications of both parties were exchanged at Washington, on the 11th of August, 1853, and proclamation thereof was made by the President of the United States on the 12th of August, 1853. See 10 U. S. Stat. at Large, p. 992.

The appellees contend that the ratifications relate back to the date when the treaty was signed, and that it was, therefore, operative from and after the 23d February, 1853.

In the silence of a treaty relative to the time when it shall take effect, this would probably be a correct interpretation. See *United States* v. *Reynes*, 9 Howard, 148 ; 1 Kent's Com. 169.

But, in this case, the contracting powers have signified their will by stipulating in the convention itself, that it shall remain in force for the space of ten years "*from the day of the exchange of the ratifications,* which shall be made in conformity with the respective Constitutions of the two countries, and exchanged at Washington within the period of six months, or sooner if possible."

The treaty, therefore, did not become operative until the 11th of August, 1853, and the rights of the State of Louisiana to claim the ten per cent. tax vested upon the death of *Schaffer* in July previous.

In respect to the other items mooted on either hand, we find the opinion of the District Judge to be sustained by the evidence.

Judgment affirmed.